# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 17-cr-757 |
| v. | ) Judge Sharon Johnson Coleman |
| JACKIE EDWARDS, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The defendant, Jackie Edwards, is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Edwards now moves this Court to suppress the evidence that was recovered as a result of a traffic stop and the subsequent search of Edwards' person and car that occurred on November 15, 2017. For the reasons set forth, that motion is denied.

**Procedural Background**

Edwards was arrested on November 15, 2017, and charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He was subsequently indicted in late November. In March of 2018, Edwards filed a motion to suppress, asserting that the evidence obtained as a result of his traffic stop, including the firearm giving rise to this case, was unconstitutionally obtained because there was not reasonable suspicion to justify the traffic stop. After briefing, this Court denied that motion without a hearing. After changing lawyers, Edwards filed a subsequent motion for reconsideration, asserting that the traffic stop constituted an arrest rather than a *Terry* stop and that the Court accordingly applied the incorrect legal standard. In light of these arguments, this Court held an evidentiary hearing, at which both sides presented evidence. The Court

1

subsequently invited the parties to file closing briefs restating their legal arguments in light of the evidence presented.

**Background**

The following facts are those established by the evidence presented to this Court at the evidentiary hearing except where otherwise noted.

DEA officers in St. Louis, including Task Force Officer Budds, were investigating a suspected drug trafficker in the Chicago area who was supplying narcotics to St. Louis. Intercepted phone calls to that suspect by a phone number identified as Edwards' gave rise to suspicion that Edwards was involved in drug trafficking as well. Agents subsequently began intercepting Edwards' calls pursuant to a court order. Those intercepted calls yielded further evidence that Edwards was involved in drug trafficking, and led to the identification of his suspected supplier, Thayer Daineh. From these calls, the agents concluded that Daineh had supplied Edwards with marijuana and that Edwards was in the process of repaying Daineh. On November 9, 2017, Budds contacted Chicago-based DEA Special Agent Lech and Task Force Officer Savarino to inform them of the investigation into Edwards.

Later on November 9, 2017, the St. Louis agents intercepted a telephone call in which Edwards was informed that an unknown individual was planning to rob Edwards. Edwards subsequently received photos of the unknown individual and his car, which he distributed to other individuals. TFO Budds contacted TFO Savarino to advise him of this incident. On November 14, 2017, agents in St. Louis intercepted a call in which Edwards talked about having a pistol, stating "Nothin' I needed I wasn't takin' to no police station with me shit, my pistol there my motherfuckin' everything there." Budds also had access to Edwards' criminal history, which reflected that he had convictions for drug offenses and voluntary manslaughter.

That same evening, Budds intercepted a call indicating that Daineh was going to pick up some money from Edwards' house the next morning. Budds contacted TFO Savarino and Specal Agent Lech in Chicago to request that they surveil the meeting between Edwards and Daineh, follow Daineh away from the house, and attempt to seize the payment that he was expected to receive from Edwards. During that conversation, Budds testified that he reminded the Chicago agents that Edwards was the intended target of a robbery, informed them that he had intercepted a call where Edwards discussed getting a pistol, and cautioned that Edwards had been convicted of voluntary manslaughter and drug trafficking crimes.

TFO Savarino similarly testified that Budds told him that Edwards had served time in prison for a homicide and narcotics infraction and that Edwards was a "known source of supply for heroin, cocaine, and marijuana." He also testified that Budds told him that "they did intercept some talk over the, the Title III intercepts that Mr. Edwards was bragging about having a gun or possessing a firearm." Savarino subsequently sent a text message to his group notifying them of the surveillance on November 15, 2017, which read:

> Tomorrow morning for those available St. Louis is on a wire, two targets. One lives in Bolingbrook and the other lives in Richton Park. The target who lives in Richton Park is planning for an unknown male white to pick up money from a residence. St. Louis thinks the pickup should be around 160,000. St. Louis wants us to follow the unknown male away and stop him away from the residence so not to burn the wire.
> St. Louis described the guy picking up the money as a scared white male that will only do business at the target's home or Starbucks parking lots. Tomorrow's pickup will be at the target's house in Richton Park. St. Louis believes this pickup will happen early, so lets be out on the street by 8:00 a.m. We are free to do what we want with this guy as long as we don't burn the wire.

On the morning of November 15th, Savarino informed his Group over the radio that Edwards had been intercepted "talking about a gun, bragging about having a firearm" and that he had done time for homicide and narcotics offenses.

3

On November 15th, at around 9:50 AM, a silver Hyundai pulled into Edwards' driveway. Budds simultaneously reported that Daineh had arrived at Edwards' house based on intercepted phone traffic, confirming that the individual in the car was Daineh. Daineh got out of his car with a brown bag. Edwards opened the garage door, Daineh entered the garage, and Edwards then closed the garage door behind them. At 10:00 AM, the garage door opened, Edwards and Daineh walked out, and Daineh entered his car carrying both the brown bag and an additional white plastic bag. Surveillance agents followed Daineh until a traffic stop was performed by the Illinois State Police. That traffic stop revealed that Daineh was in possession of approximately $10,000 in a brown satchel bag and $20,000 of bundled bills located in his car's center console.

Budds subsequently requested that Savarino obtain a search warrant for Edwards' house. While the application for that search warrant was pending, Budds intercepted communications indicating that Edwards intended to leave his house, possibly to take someone to the airport. That information was conveyed to Lech, who in turn radioed it to Group Supervisor Billiot. Billiot was also under the impression that Edwards would probably be armed when he left his house, based on Savarino's prior communication of that fact. Billiot relayed this information to his squad via radio.

At around 4:30 PM, Edwards left his house. Billiot, knowing that St. Louis was trying to obtain a search warrant and having been informed that Edwards might be armed, had his group follow Edwards to ensure that he did not return to his house during the middle of the execution of the search warrant. Billiot, Special Agent Santiago, and Task Force Officers Campbell and Ryczek each followed Edwards in a separate vehicle. Edwards drove for about half an hour, traveling from his home in Richton Park to the corner of 69th Street and Racine Avenue. There Edwards, traveling North on S. Racine Ave., turned right onto 69th street, made a right into an alley and another right through a parking lot. Reemerging on S. Racine Ave., he made another right onto 69th and pulled into a parking spot. Although there is no dispute as to the legality of these maneuvers, the officers

4

testified that this series of consecutive right turns, described as "squaring the block," is a common tactic used to determine whether one is being followed. Edwards testimony explained that he owned a laundromat at the corner of 69th and S. Racine Ave., and that he had circled the block looking for parking in the alley behind his business. It does not appear that the officers were aware of Edwards' business, a fact that surprises this Court given how much other information about Edwards had already been obtained.

Two unmarked law enforcement vehicles conspicuously followed Edwards through the alleyways, no doubt making Edwards aware that he was being followed if he was not already. When Edwards parked on 69th Street, Billiot pulled in behind him and activated his emergency lights to effect a traffic stop. Billiot testified that "After the series of rights, once we made the decision at this point we're going to try to stop him, it was by circumstance, not design, his choice not ours, so to speak, he just happened to pull over and stop there." He also had previously sent a message to his Group stating that "Either way, due his CQH [criminal history], we want him away from the house or in cuffs when we execute."

Per the agents' version of events, Billiot, wearing a DEA vest and armed with a long gun, approached the drivers' side door of Edwards car. Billiot called Edwards by name, identified himself as a federal agent, and informed Edwards that he was being detained. Edwards initially placed his hands out the half-open window, but subsequently kept reaching for the center console of the car. Billiot instructed Edwards to unlock the door and exit the car, and Edwards failed to comply. Instead, Edwards supposedly attempted to raise the tinted driver side window of his car, at which time Billiot performed a muzzle strike on the window to get Edwards' attention. Edwards stopped raising the window and unlocked the doors, at which time TFO Ryczek attempted to remove Edwards from the vehicle and to handcuff him. Edwards, who was described as combative, resisted the efforts to handcuff him and ultimately was taken to the ground in order to be

5

handcuffed. From the video footage, however, it is difficult to tell how much physical resistance, if any, Edwards offered. Once Edwards was on the ground and handcuffed, a pat down was performed on Edwards and a pistol was located in Edwards' right coat pocket.

Edwards does not dispute that he did not comply with commands to get out of the vehicle, although he attributes this to confusion and fright. He also testified that he could not keep his hands out of the window due to a prior shoulder injury. When removed from the car, he claims he was given conflicting commands, which is why he did not immediately obey them.

**Discussion**

Edwards contends that the stop in this case crossed the constitutional boundary into being an arrest, and that the government was therefore required to have probable cause to support that arrest. Alternatively, Edwards asserts that the government lacked reasonable suspicion to detain him. Because the determination of whether the stop constituted an arrest or a *Terry* stop turns, in part, on the information available to the officers regarding Edwards, this Court turns first to the question of whether the officers involved possessed reasonable suspicion to support performing a *Terry* stop.

In *Terry v. Ohio*, the Supreme Court noted that not all interactions between policemen and citizens require probable cause, and that police officers can stop and detain individuals for certain investigative purposes. *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* stops are permissible when a police officer has a reasonable suspicion, supported by articulable facts, that criminal activity has or is likely to occur. *Id.* at 21–22. While reasonable suspicion requires less than probable cause, it requires more than a mere hunch. *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011). The Seventh Circuit has held that the determination of whether an officer has a reasonable suspicion is to be based on "the totality of the circumstances" and "common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401

F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)); *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (citing *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996)). An officer conducting a *Terry* stop may pat down a suspect in order to search for weapons, but only if "specific and articulable facts" support a suspicion that the suspect is armed and presents a danger to officers or to others. *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007).

The officer involved in a traffic stop need not be personally aware of all of the "specific and articulable" facts justifying the stop, so long as a law enforcement officer who is aware of such facts relays his or her reasonable suspicion to the officer effecting the stop. *United States v. Nafzger*, 974 F.2d 906, 908 (7th Cir. 1992). Even bulletins stating that an individual was wanted for investigation in connection with a felony have been found to be sufficient to provide such "collective knowledge," so long as the issuing officers themselves had adequate basis for effecting a stop. *United States v. Hensley*, 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

As the Supreme Court wrote:

> [I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, the reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. . . .
> In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

*Id.* at 231–32.

Here, Budds had intercepted numerous conversations with Edwards indicative of drug trafficking. Specifically, in multiple calls Edwards was heard discussing or negotiating numbers consistent with contemporaneous prices for set quantities of marijuana, directing an individual to

7

obtain "four units" of something from his office but to "spray that spray" before leaving (supposedly to mask the smell of marijuana), and engaging in unidentified transactions with Daineh. Budds testified, and the Seventh Circuit has recognized, that those involved in drug trafficking are often armed. *See United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988). Budds was also aware of Edwards' criminal history, which included prior narcotics offenses and a voluntary manslaughter conviction. Finally, Budds intercepted a phone call on November 14, 2017, in which Edwards admitted to possessing a pistol. This was consistent with the fact that Edwards had previously been informed that he was the potential target of a robbery scheme and had distributed photographs of the suspected individual. All of this information was conveyed, through Savarino and Lech, to Billiot and the agents who stopped Edwards.

The transcript of the intercepted calls makes clear that Edwards referenced needing to pick up his pistol on one occasion. Budds testified that he informed Lech and Savarino that St. Louis had intercepted a call where Edwards talked about going by a house and getting a pistol. But when Savarino testified, he claimed that Budds told him that Edwards was bragging about carrying a gun and carried a weapon "all the time." Savarino subsequently informed his group that Edwards had been intercepted talking or bragging about having a gun. Billiot, however, testified that he learned that St. Louis "believed that Edwards would be armed when he left his house," and that he obtained this information over the radio from Lech, not Savarino.

Similar mischaracterization occurred regarding the extent of Edwards' suspected involvement in narcotics trafficking. Although Budds testified only to suspecting Edwards of dealing in marijuana, Savarino described Edwards as a source of supply for heroin, cocaine, and marijuana. At least some of this misinformation made its way to the officers who effected the stop; Billiot testified that he believed St. Louis was investigating Edwards for heroin and marijuana trafficking.

8

These mischaracterizations and embellishments are extremely concerning. Information about the likelihood that an individual will be armed and about the nature of their suspected criminal conduct bears directly on how law enforcement officers react to that individual's actions. The mischaracterizations reflected by the record in this case needlessly inflated the perceived threat that Edwards' posed, increasing the risk that Edwards or law enforcement officers would be injured because of their interaction. The Court can see no possible justification for such careless handling of information that impacts the safety of both law enforcement officers and the general public.

Although the Court finds these inconsistencies to be troubling, however, the Court does not find that they or other embellishments made from the stand were material for the purpose of this motion. Under the collective knowledge doctrine, it was sufficient for the officers who stopped Edwards to act in objective reliance on the information provided by St. Louis, so long as that information was itself sufficient to support a stop. As previously noted, St. Louis had enough evidence before it to support a reasonable suspicion that Edwards may be engaged in drug trafficking and was a convicted felon in possession of a firearm. St. Louis conveyed these suspicions to the Chicago agents, all of whom were consistent in their understanding that St. Louis suspected that Edwards was engaged in drug trafficking and was potentially armed. These communications of suspicion were sufficient to support the Chicago agent's decision to stop Edwards, even if the Chicago officers had also been provided with additional, inaccurate information. *See Nafzger*, 974 F.2d at 912 (recognizing statements that the defendant was suspected of being a member of a stolen car ring and probably had stolen cars at his residence as sufficient to satisfy the collective knowledge doctrine). The inconsistencies previously discussed, although concerning, did not change the fact that St. Louis communicated enough true information to warrant an investigative stop.

The agents who stopped Edwards knew, from both their own investigation and from the information provided by St. Louis, that Edwards had engaged in conversations indicative of drug

9

trafficking, that an individual stopped leaving Edwards' house was in possession of large amounts of cash, that Edwards had a prior felony conviction and prior convictions for narcotics trafficking, that Edwards had stated that he was in possession of a firearm on the previous day, and that Edwards had been informed that he was being targeted for a robbery. These facts provided a reasonable basis for the belief that Edwards was carrying a firearm in violation of federal law.

Of course, agents could have stopped Edward at any time based on that suspicion. There is no real dispute here why Edwards was stopped when he was. Agents followed Edwards down multiple alleys when he "squared the block." Edwards actions, and the agents' decision to conspicuously follow him through the alleys, created a strong likelihood that Edwards knew he was being followed, and Billiot admitted that the decision to stop Edwards resulted from the fact that he had "squared the block." The agents were clearly concerned about the potential that Edwards, if he was illegally armed, would evade them and return home during the execution of the anticipated search warrant.

Edwards' stop and subsequent detention would not be permissible solely to facilitate the search of Edwards' house. *See Bailey v. United States*, 568 U.S. 186, 201, 133 S.Ct. 1031, 185 L.Ed.2d 19 (2013) (recognizing that detentions incidental to the execution of a search warrant are only permissible in the immediate vicinity of the search). Here, however, the search warrant was the trigger but not the cause of Edwards' detention. The stop did not occur because of the search warrant or the agents' blown cover; it occurred because the agents were worried that Edwards was armed and would pose a threat to public safety if he returned home during the execution of the search warrant. The stop was thus ultimately the result of the agent's reasonable suspicion that Edwards, a convicted felon, was in possession of a handgun.

Edwards contends that the stop constituted an arrest because the level of force used far exceeded what was reasonable under the circumstances. There is no bright line rule separating *Terry*

stops from formal arrests. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). Instead, the distinction depends on the intrusiveness of the detention and whether the officers' actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*; *Terry*, 392 U.S. at 20. Although the use of reasonable force is a "necessary corollary" to law enforcement officers' ability to conduct an investigatory stop, use of force can escalate to the point where the encounter becomes a formal arrest. *United States v. Colbert*, No. 12-cr-603-1, 2013 WL 2477074, at *4 (N.D. Ill. June 10, 2013) (Lee, J.). In evaluating whether the force used to effectuate an investigatory stop is so disproportionate as to convert the encounter into a full arrest, courts consider whether the surrounding circumstances gave rise to a justifiable fear for personal safety and the defendant's own action in resisting an officer's efforts. *Id.* "Where the suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is a commonplace, police may protect themselves by displaying their weapons." *United States v. Lechuga*, 925 F.2d 1035, 1040 (7th Cir. 1991). Such display has been recognized as an "unfortunate but necessary accommodation" between the Fourth Amendment's protections and the danger that investigative detentions involving suspects in vehicles can pose to police officers. *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). Other factors to be considered include whether the stop was longer than necessary to confirm or dispel the officer's suspicions, the location of the stop, the time of day, and the suspect's reaction to the approach of police. *Lechuga*, 925 F.2d at 1040.

In asserting that his traffic stop constituted an arrest, Edwards points to the fact that Billiot, who was armed with a rifle, and three other officers armed with handguns surrounded his car within a minute of the stop. Edwards, however, offers no legal authority establishing that the presence of four officers or the show of firearms is sufficient to convert a *Terry* stop into an arrest. Billiot approached Edwards' car first, wearing a DEA bulletproof vest and carrying a rifle. Once Billiot

11

approached Edwards car, it was almost 30 seconds before the next officer reached it, and none of the officers were running, pointing their weapons at Edwards, or otherwise conducting themselves in an excessively combative manner. It is undisputed that the stop in question occurred after dark, while Edwards was driving a vehicle with tinted windows. It is further undisputed that Edwards failed to fully comply with Officers' instructions to unlock the doors to his car or to keep his hands out the window. In these circumstances, the presence of four officers with weapons at the ready was not unreasonable in light of their belief that Edwards might be armed. *Lechuga*, 925 F.2d 1040 ("Where the suspect is thought to be armed . . . police may protect themselves by displaying their weapons."); *see also United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) (recognizing that invasive tactics may be warranted in drug-related traffic stops because the link between guns and the drug trade makes such stops inherently dangerous); *cf. United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988) (holding that it was not unreasonable for a lone officer stopping a suspected narcotics trafficker in a vehicle at night to point a gun at the driver). Although Edwards attempts to challenge the agents' testimony that they feared he was armed by noting that at various points officers lowered or reholstered their weapons, such tactical decisions are not indicative of the agents' assessment of Edward's dangerousness.[1]

Following the evidentiary hearing, Edwards conceded on page 15 of his post-hearing brief that the show of force that he was challenging was based on the force present at the time the stop was initiated and not later on. Accordingly, the Court does not address the muzzle strike or Edwards' subsequent removal from his car. Accordingly, the Court concludes that the stop in question was not so intrusive as to cross the line from being a *Terry* stop to an arrest.

---

[1] Although the Court declines to hold that the agents' conduct in stopping Edwards was unreasonable, the Court is compelled to question whether the previously discussed misstatements about Edwards' suspected conduct might have influenced the amount of force that was displayed and used when he was stopped.

As previously noted, the Court is compelled to conclude that there was sufficient evidence known to the officers involved to provide a reasonable suspicion that Edwards was in violation of federal law. The Court accordingly finds no grounds on which this Court could suppress the results of this search.

**Conclusion**

For the foregoing reasons, Edwards' motion to suppress the evidence recovered from his person or in his vehicle is denied.

SO ORDERED.

_____
Sharon Johnson Coleman
United States District Court Judge

DATED: 2/26/2019